UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

CITY OF WESTLAND POLICE AND FIRE       :
RETIREMENT SYSTEM, Individually and on  :
Behalf of All Others Similarly Situated,        :
                                               :
                        Plaintiff,            :
                                               :
            vs.                                :
                                               :
PHILIP MORRIS INTERNATIONAL INC.,       :
ANDRÉ CALANTZOPOULOS, MARTIN G.      :
KING and JACEK OLCZAK,                   :
                                               :
                        Defendants.          :
——————————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Philip Morris International Inc. ("Philip Morris" or the "Company"), Company press releases, earning calls, analyst reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Philip Morris common stock between February 8, 2018 and April 18, 2018 (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2.      Philip Morris is one of the largest and most recognizable cigarette and tobacco manufacturing companies in the world.  The Company's subsidiaries and affiliates and their licensees are engaged in the manufacture and sale of cigarettes and other nicotine-containing products in markets outside of the United States.  For years, the Company has been facing stagnant or negative sales trends due to declining smoking percentages worldwide.  Throughout the Class Period, Defendants reassured investors that these trends were being successfully offset by new sales initiatives and that favorable sales trends at the end of 2017 had continued into the first quarter of 2018.

3.      As alleged herein, these statements were materially false and misleading when made because Defendants knew, or recklessly disregarded, that Philip Morris was experiencing a faster decline in overall cigarette and e-cigarette (or "heated tobacco") sales volumes during the first quarter of 2018 than investors had been led to believe, that its much-lauded sales initiatives had stalled, and that it was experiencing adverse sales headwinds in key markets.  As a result of these

misrepresentations, Philip Morris stock traded at artificially inflated price levels throughout the Class Period.

4.     With the price of Philip Morris stock artificially inflated, Company insiders sold millions of dollars' worth of their own Philip Morris shareholdings.  On February 22, 2018 – one day after making rosy statements about the Company's ongoing sales trends and expected results to investors – the Company's Chief Executive Officer ("CEO"), André Calantzopoulos ("Calantzopoulos"), sold 49,000 shares of Philip Morris stock at $103.66 per share for over $5 million in gross insider trading proceedings.  This sale was unusual in both timing and amount, representing a greater than 22% increase over the next greatest number of shares sold by Defendant Calantzopoulos in a single day in at least the preceding five years.

5.     Then, on April 19, 2018, Philip Morris issued a press release announcing disappointing results for the Company's first quarter of 2018.  Against its easiest prior-year comparison, the Company reported that combined cigarette and heated tobacco unit shipment volume had declined by 2.3% during the quarter.  The Company also stated that key sales initiatives had stalled, as the Company's heated tobacco unit growth had plateaued due to market demographics and faltering consumer conversion tactics and, further, that cigarette shipments had fallen by 5.3% during the quarter, signaling persistent adverse trends in the business.

6.     On this news, the price of Philip Morris stock declined $15.80 per share, or more than 15%, to close at $85.64 per share on April 19, 2018.  This represented the worst daily decline for the Company in nearly a decade and a closing price more than 17% below the price at which Defendant Calantzopoulos had sold his Philip Morris stock less than two months before.

7.     As a result of Defendants' wrongful acts and omissions, plaintiff and the Class purchased Philip Morris common stock at artificially inflated prices.  However, after the above

- 2 -

revelations entered the market, the price of Philip Morris stock dropped nearly 22% from its Class Period high, causing economic harm and damage to plaintiff and the Class.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

10.     Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District and the Company's corporate headquarters are located in this District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff City of Westland Police and Fire Retirement System purchased Philip Morris common stock during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

13.     Defendant Philip Morris is an international purveyor of tobacco-related products. The Company is incorporated in Virginia and headquartered in New York, New York.  Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "PM."

14.     Defendant André Calantzopoulos served as the CEO of Philip Morris throughout the Class Period.

- 3 -

15.     Defendant Martin G. King ("King") served as the Chief Financial Officer ("CFO") of Philip Morris throughout the Class Period.

16.     Defendant Jacek Olczak ("Olczak") served as the Chief Operating Officer ("COO") of Philip Morris throughout the Class Period, and in this capacity was responsible for the Company's global strategy and delivery of results for cigarette and heated tobacco units.  Prior to January 1, 2018, Olczak was the Company's CFO.

17.     The Defendants referenced above in ¶¶14-16 are collectively referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false and misleading statements that artificially inflated the price of Philip Morris common stock.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Philip Morris's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

## BACKGROUND

18.     Incorporated in 1987, Philip Morris is a holding company engaged, through its subsidiaries and affiliates, in the manufacture and sale of cigarettes, other tobacco products and other nicotine-containing products outside the United States.  In 2008, the Company was spun off from

operating company Altria Group, Inc., which focuses on the sale of tobacco products inside the United States.  Marlboro is the Company's most recognized and best-selling product.

19.     Large tobacco manufacturers have been under the threat of declining sales volumes for years, as the number of smokers has decreased globally, offset somewhat by population growth. Companies have been able to push through price increases to make up for falling volumes in order to sustain revenues and profits.  In addition, companies such as Philip Morris have branched out into alternative smokeless products to increase sales volumes and market share.  Using these strategies, Philip Morris was able to increase annual net revenues from $73.9 billion in fiscal 2015 to $78.1 billion in fiscal 2017, an increase of over 5%.

20.     Philip Morris has two main categories of tobacco products: (i) cigarettes; and (ii) heated tobacco units.  The vast majority of the Company's sales derive from cigarettes, which include the Company's well-known and traditional brands such as Marlboro.  Heated tobacco units were only recently introduced by the Company.  Between 2016 and 2017, the Company's total cigarette shipment volumes decreased from about 812.9 billion units to about 761.9 billion units. During this same time, sales of the Company's heated tobacco products increased from about 7.4 billion units to over 36.2 billion units.  Thus, it was critically important to investors and the Company's long-term prospects that Philip Morris stem the tide of lower cigarette sales volumes and continue to increase its heated tobacco unit sales volumes.

**MATERIALLY FALSE AND MISLEADING**
**STATEMENTS DURING THE CLASS PERIOD**

21.     The Class Period begins on February 8, 2018.  On that date, Philip Morris issued a press release announcing its results for the quarter and year ended December 31, 2017 ("FY 2017 Press Release").  The FY 2017 Press Release stated that the Company's net revenues, excluding excise taxes, had increased 7.7% for the year to $28.7 billion, up 9.4% year-over-year excluding

unfavorable currency impacts.  For the quarter, the FY 2017 Press Release stated that the Company's cigarette and heated tobacco unit shipment volumes had increased by 3.8% to 212.1 billion and its net revenues, excluding excise taxes, had increased by 19% to $8.3 billion.  The FY 2017 Press Release also provided a 2018 full-year forecast that projected net revenue growth of over 8%, excluding excise taxes.  Defendant Calantzopoulos commented on the results, representing that the Company's strong momentum from its fourth quarter results had carried into the new year and set a "strong foundation" in traditional cigarette sales and for accelerating growth in heated tobacco units. The press release stated in pertinent part as follows:

> "A strong fourth-quarter performance helped drive robust full-year results, exemplified by currency-neutral, double-digit adjusted earnings per share growth, despite previously disclosed challenges in Russia and Saudi Arabia . . . ."

> "The excellent performance of our flagship smoke-free product IQOS – not only in Asia, but also in the vast majority of our launch geographies – underscored its great promise and the commitment of our employees to lead the transformation of our industry towards a smoke-free future.  ***Continued investment behind IQOS in 2018 is expected to further drive its positive momentum***."

> "For the first time since 2011, we have entered the year with annual guidance that reflects a positive currency impact.  Our combustible product portfolio provides us with a strong foundation.  The confirmed potential of our smoke-free alternatives reinforces our strong determination to deploy all necessary resources to accelerate their growth, which will drive our business success and ability to generously reward our shareholders over the long term."

22.  On the same day, Philip Morris held a conference call with analysts and investors to discuss its financial results and operations.  Defendants Calantzopoulos and King participated on the call, among others.  Regarding the improvement in the Company's total sales volume in the fourth quarter, Defendant Calantzopoulos stated:

> ***The sequential improvement in our quarterly volume performance continued in the fourth quarter***, with heated tobacco unit growth driving a total shipment volume increase of 3.8% or 1.4%, excluding inventory movements.  For the year, heated tobacco unit shipment volume nearly quintupled to reach $36.2 billion.

- 6 -

The sequential growth in our total international market share, excluding China and the U.S., also continued in the fourth quarter.  Since the first quarter, our quarterly share for heated tobacco units and cigarettes increased by 0.7 and 1.1 points, respectively.

*         *         *

While our total cigarette share declined by 3.7 points last year, **we recorded strong sequential share growth, beginning in the second quarter**.  Full year cigarette industry volume declined by 5.6%, mainly due to the impact of excise tax-driven price increases on lower-priced brand.  In fact, volume in the Premium segment, which is essentially Marlboro, increased.

23.     During the conference call, Defendant Calantzopoulos highlighted the Company's "spectacular performance" in Japan, which he represented was driven by heated tobacco unit sales, and that "total shipment volume increased by 13.1%" in the country.  Defendant Calantzopoulos also stated that Philip Morris expected this demand "**to grow further in the first quarter** following a planned lifting of the restriction on iQOS device sales; the establishment of appropriate distributor inventory levels of heated tobacco units, given the current high dependence on a single manufacturing center; and the transition from air to sea freight of heated tobacco unit shipments, largely completed in the fourth quarter of 2017."

24.     Continuing his prepared remarks, during the conference call, Defendant Calantzopoulos represented that these favorable growth trends were continuing and would drive favorable growth in 2018.  He stated the following in pertinent part:

> **In conclusion, our robust business performance in 2017 underscored the enormous promise of reduced-risk products, the enduring strength of our combustible product portfolio and the commitment of our employees to lead the transformation of our industry**.  We recorded strong full year currency-neutral adjusted financial results, highlighted by our highest annual net revenue growth, excluding currency and acquisitions, since our spinoff in 2008.
>
> **IQOS is performing exceptionally**, demonstrating the importance of our investments and our ability to transfer and apply learnings across markets.

25.     Later, in response to an analyst question about increased inventory shipments to Japan and the size of the market opportunity there, Defendant Calantzopoulos stated:

> Look, we had to build these inventories for the reasons I explained, so ***I don't see this decreasing.  If I see anything as the volume goes up, it has to be adjusted, obviously, upwards over time***. . . .   The second one is, look, we have our own projection for total market in Japan, including obviously HeatSticks.  And ***there's nothing in the horizon that would affect – that would cause any change in what happened in the previous years***.

26.     On February 13, 2018, Philip Morris filed its Annual Report on Form 10-K with the SEC ("2017 Form 10-K").  The 2017 Form 10-K repeated and restated the annual and quarterly financial results and outlook of "over 8.0%" net revenue growth provided in the FY 2017 Press Release.  In addition, the 2017 Form 10-K stated that favorable sequential sales trends experienced by the Company in the fourth quarter of 2017 had continued into the first quarter of 2018.  For example, the 2017 Form 10-K stated the following in pertinent part:

> Excluding the favorable net impact of estimated cigarette and heated tobacco unit inventory movements of approximately 3.3 billion units, our total shipment volume decreased by 3.1%.  ***The favorable inventory movements were driven primarily by approximately 8.5 billion units net in Japan reflecting: the increasing demand for HeatSticks, anticipated to further increase in the first quarter of 2018*** following a planned lifting of the restriction on IQOS device sales; the establishment of appropriate distributor inventory levels of heated tobacco units, given the current high dependence on a single manufacturing center; and the transition from air freight to sea freight of heated tobacco units, largely completed in the fourth quarter of 2017.

Defendants Calantzopoulos and King signed the 2017 Form 10-K and certified that it was accurate, not misleading and free from fraud.

27.     On February 21, 2018, Defendants Calantzopoulos, King and Olczak presented on behalf of Philip Morris at the Consumer Analyst Group of New York Conference.  In his prepared remarks, Defendant Calantzopoulos stated that the Company was "progressing" on various initiatives "to accelerate growth" in heated tobacco unit sales.  Defendant Calantzopoulos later stated that Philip Morris should be considered a "***growth stock***," because "***8%-plus currency-neutral net***

*revenue growth is not just a 2017 or 2018 phenomenon*" for the Company, but would likely continue into the future based on existing trends and initiatives in the business.  According to Defendant Calantzopoulos, "*returns on our investment to accelerate consumer switching this year will mostly be realized next year*, further improving our year-over-year comparisons.  So EPS results in 2019 are very likely to be better than those this year."

28.     As part of his prepared remarks, Defendant Olczak used Japan as an example to illustrate the purported success of the Company's sales initiatives for increased heated tobacco unit volumes.   Specifically, Defendant Olczak highlighted the Company's purported success in converting Japan's existing adult population to heated tobacco products, stating: "As the understanding of the category and its benefits are established in adult smoker communities, *iQOS starts enjoying word of mouth as adult smokers share experiences with friends and peers*.  Although this varies according to countries and cultures, it is universally true."  He continued, stating that Philip Morris would go "deeper with iQOS into [its] existing launch markets," which included Japan, and that it planned "to further deploy [its] many learnings across these markets to accelerate growth."

29.     Defendant Olczak further stated that accelerating growth trends at the end of 2017 had continued into 2018.  He stated the following in pertinent part:

> [W]e recorded sequential growth in our heated tobacco unit national market shares in 2017.  *This growth trend continued in January of 2018*, with standout performances in Korea, Portugal and Romania.  There was a similar growth trend in the focus area offtake shares for our markets that are more targeted geographically.
>
> *This strong growth continued in January.  Our weekly offtake shares in Japan continued to grow in January, both nationally and in the prefectures where the heated tobacco category is the most mature from a competitive standpoint*: Fukuoka, Sendai and Tokyo.  In Sendai specifically, our weekly offtake share growth in January drove further growth in our heated tobacco category share.  In fact, the category's growth was driven primarily by iQOS.

*Our strong share performances for iQOS continue to be underpinned by high iQOS switching across markets. This generally reflects rates of full and predominant conversion ranging from around 70% to 90%.* iQOS switching rates in certain markets are beginning to reflect the emerging presence of competition in the heated tobacco category as iQOS purchasers experiment with newly available products, even if just temporarily. The most obvious example is Japan, where there are now several heated tobacco products.

30. The following slides were included with Defendants' presentation and purported to show that Philip Morris had rapidly expanded its heated tobacco unit sales in Japan and had continued to increase market share in the first quarter of 2018, in particular by converting adult smokers and because of the success of the Company's sales initiatives:

## Smoke-Free Future: Significant Progress in Our Strategy 



Japan: *HeatSticks* National Market Share (%)

14.1

0.4

December 2015

December 2017

Source: PMI Financials or estimates, and Tobacco Institute of Japan          7



## IQOS: *HeatSticks* Offtake Share Growth Continues in Japan

|  | Weekly Offtake Shares (%) | | | | |
|---|---|---|---|---|---|
|  | 2017 | | | 2018 | Variance |
| **Week ending:** | **Jan-29** | **Jul-2** | **Dec-31** | **Jan-28** | **Jan-28 vs. Dec-31** |
| **Fukuoka** | 7.5 | 11.5 | 15.1 | 16.0 | +0.9pp |
| **Sendai** | 13.0 | 17.2 | 20.0 | 20.5 | +0.5pp |
| **Tokyo** | 9.5 | 14.9 | 17.7 | 18.6 | +0.9pp |
| **National** | 7.7 | 12.8 | 16.2 | 16.8 | +0.6pp |

Note: Offtake share represents select C-Store sales volume for *HeatSticks* as a percentage of the total retail sales volume for cigarettes and heated tobacco units
Source: PMI Financials or estimates                                                                                                           45

## *IQOS*: Adult Smoker Switching in Japan



• 68% of *IQOS* purchasers switched exclusively to the heated tobacco category

Of this group:
- 82% use *IQOS* only within the heated tobacco category
- 9% use *IQOS* predominantly (>70% of their daily tobacco use)
- 8% use *IQOS* less than predominantly
- 1% have completely switched from *IQOS* to other competitive heated tobacco products

Note: Status as of December 2017
Source: IQOS User Panels

48

31.    The statements referenced in ¶¶21-30 above were materially false and misleading when made because they failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that favorable sales trends experienced by the Company in the fourth quarter of 2017 had not continued through the first quarter of 2018;

(b)    that declines in the Company's cigarette shipments had accelerated on a sequential basis in the first quarter of 2018, despite a relatively easy prior-year comparison;

(c)    that shipments of the Company's heated tobacco units were on track to decline 39% sequentially in the first quarter of 2018;

(d)    that the Company's sales initiatives designed to convert adult smokers in Japan to heated tobacco units had faltered, and the Company's near-term growth prospects in key Japanese markets had plateaued;

(e)    that the Company's market share for its heated tobacco category in Japan was declining in February 2018 and favorable growth trends had not been sustained;

- 12 -

(f)      that new product sales initiatives and attempts to generate revenue through price increases would not be able to sustainably offset declining sales volumes in the Company's combustible products as had been represented to investors; and

(g)      that, as a result of (a)-(f) above, the Company was not on track to sustain currency neutral net revenue growth above 8% for 2018 and 2019, and such estimates lacked a reasonable basis.

32.      Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." The failure of the 2017 Form 10-K to disclose the facts listed in ¶31 violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenue and income from continuing operations.

33.      Then, on April 19, 2018, Philip Morris reported its financial results for the quarter ended March 31, 2018 ("1Q18 Release").  The Company revealed that it had only achieved cigarette and heated tobacco unit shipment volumes of 173.8 billion units, a decline of 2.3%.  This result was significantly worse than consensus estimates of a total volume decline of only 0.6%.  Similarly, the Company's cigarette volumes declined 5.3%, despite being compared against an 11.5% decline from the prior-year quarter.  The Company's heated tobacco unit sales fared particularly poorly, with quarterly sales of only 9.6 billion units compared to consensus estimates of 13.2 billion units, which represented a sequential *decline* of nearly 39%.

34.      The 1Q18 Release further revealed that growth had slowed in the same key Japan markets that had been highlighted by Defendants.  In addition, the release revealed that the Company

was no longer positioned to achieve net revenue growth greater than 8%, notwithstanding Defendant Calantzopoulos' statement more than halfway through the disappointing quarter that this growth rate would be maintained for the foreseeable future.  Later, in connection with its second quarter 2018 results, Philip Morris revealed that it was only on track to achieve 3% to 4% projected currency neutral net revenue growth for 2018.

35.     While the 1Q18 Release disclosed that the Company's sales initiatives were having limited success in converting "'more conservative adult smoker segments,'" Defendants further revealed the troubling extent of the problem on an earnings call held that same day.  On the call, Defendant King disclosed that the Company's sale of heated tobacco units in Japan had hit a "plateau."  Rather than being needed to meet growing demand as was represented to investors, Defendant King stated that Philip Morris's increased shipments to Japan at the end of 2017 had come "close to saturating the early adopters and innovators," as sales initiatives had stalled throughout the quarter.  Defendant King also revealed that the Company had achieved Japan market share for March of 15.6%, which implied that February – the same month during which Defendants had touted a "growing" Japan market share of "16.3%" – had been the ***worst month*** of the quarter.

36.     On this news, the price of Philip Morris stock fell sharply.  On April 19, 2018, Philip Morris stock closed at $85.64 per share, a one-day decline of $15.80 per share, or more than 15%, on abnormally large trading volume of more than 45 million shares.

### ADDITIONAL SCIENTER ALLEGATIONS

37.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in actions or acquiesced in the issuance or dissemination of such statements or documents intended to manipulate the market price

of Philip Morris common stock as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Philip Morris, their control over, and/or receipt or modification of Philip Morris's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Philip Morris, participated in the fraudulent scheme alleged herein.

38.     The adverse developments at issue impacted the Company's most important revenue streams and related to the Company's most closely watched and important markets and products. Increasing Philip Morris's revenues – despite declining global cigarette consumption – and increasing heated tobacco unit sales were key initiatives throughout the Class Period. The Individual Defendants, in particular, held themselves out to the market as the representatives of the Company most knowledgeable on these topics.

39.     In addition, the suspicious timing and nature of the sales of Philip Morris stock during the Class Period by Company insiders adds to the indicia of scienter. On February 22, 2018, Defendant Calantzopoulos sold 49,000 shares of Philip Morris stock at $103.66 per share, allowing him to reap more than $5 million in gross proceeds from insider trading. This sale occurred only one day after Defendant Calantzopoulos had made materially false and misleading statements to the market as alleged herein and more than halfway through the Company's disappointing first quarter of 2018. This sale also occurred near peak trading prices during the Class Period and at more than $18 above the price Philip Morris shares fell to after revelations of the truth entered the market. In addition, the sale was the largest ever by Defendant Calantzopoulos in his position as CEO of the Company and more than 22% above his next largest sale of Philip Morris stock in at least the preceding five years.

## LOSS CAUSATION AND ECONOMIC LOSS

40.     As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Philip Morris common stock and operated as a fraud or deceit on purchasers of Philip Morris common stock.  As detailed above, when the truth about Philip Morris's misconduct was revealed, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's prices.  The decline in Philip Morris's share price was the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price decline negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

41.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Philip Morris's business, operations and financial condition, as alleged herein.  Before the time of plaintiff's purchases of Philip Morris common stock, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Philip Morris stock to be artificially inflated.  Plaintiff and other Class members purchased Philip Morris shares at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

42.     At all relevant times, the market for Philip Morris common stock was an efficient market for the following reasons, among others:

(a)     Philip Morris stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's 2017 Form 10-K, Philip Morris had more than 1.5 billion shares of stock outstanding as of January 31, 2018, demonstrating a very active and broad market for Philip Morris common stock;

(c)     as a regulated issuer, Philip Morris filed periodic public reports with the SEC;

(d)     Philip Morris regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Philip Morris was rapidly reflected in and incorporated into the Company's stock price.

43.     As a result of the foregoing, the market for Philip Morris common stock promptly digested current information regarding Philip Morris from publicly available sources and reflected such information in Philip Morris's share price.  Under these circumstances, a presumption of reliance applies to plaintiff's purchases of Philip Morris common stock.

44.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Philip Morris's business and

operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

45.    Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by Defendants, but rather were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

46.    Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

47.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Philip Morris who knew that the FLS was false.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

48.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Philip Morris common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families, and Defendants' legal

- 18 -

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

49.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Philip Morris stock was actively traded on the NYSE. There are likely thousands of members in the proposed Class, if not more.  Record owners and other members of the Class may be identified from records maintained by Philip Morris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

50.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

51.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

52.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Philip Morris;

(c)     whether the price of Philip Morris common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5
Against All Defendants**

54.     Plaintiff incorporates the foregoing paragraphs by reference.

55.     Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and other members of the Class in connection with their purchases of Philip Morris common stock.

- 20 -

57.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for Philip Morris common stock.  Plaintiff would not have purchased Philip Morris stock at the prices paid, or at all, if plaintiff had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

58.     As a direct and proximate result of Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of Philip Morris common stock.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

59.     Plaintiff incorporates the foregoing paragraphs by reference.

60.     The Individual Defendants acted as controlling persons of Philip Morris within the meaning of §20(a) of the 1934 Act.  By virtue of their high-level positions, stock ownership and their power to control public statements about Philip Morris, the Individual Defendants had the power and ability to control the actions of Philip Morris and its employees.  The Individual Defendants participated in and had awareness of the Company's operations and intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public.  The Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Declaring that Defendants violated the 1934 Act and awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.     Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 4, 2018               ROBBINS GELLER RUDMAN &
                                          DOWD LLP
                                       SAMUEL H. RUDMAN


                                          */s/ Samuel H. Rudman*
                                       SAMUEL H. RUDMAN

                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN &
  DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
bcochran@rgrdlaw.com

VANOVERBEKE, MICHAUD &
  TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Attorneys for Plaintiff*