UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/21/2020
```

No. 18-CV-08049 (RA)

IN RE PHILIP MORRIS INTERNATIONAL
INC. SECURITIES LITIGATION

MEMORANDUM OPINION
& ORDER

RONNIE ABRAMS, United States District Judge:

Lead Plaintiffs Union Asset Management Holding AG and Teamsters Local 710 Pension Fund bring this class action against Defendants Philip Morris International Inc. ("Philip Morris" or the "Company"), André Calantzopoulos, Martin G. King, Patrick Picavet, Jacek Olczak, Manuel C. Peitsch, and Frank Lüdicke (collectively, the "Individual Defendants") alleging that, from July 26, 2016 through April 18, 2018 (the "Class Period"), they committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10(b)-5. Plaintiffs allege that Defendants made false and misleading statements to the U.S. Food and Drug Administration ("FDA") about clinical trials Philip Morris conducted in connection with its Modified Risk Tobacco Product Application for a smoke-free electronic device entitled iQOS, as well as about the performance of iQOS in Japan.

On February 4, 2020, the Court granted Defendants' motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act. Dkt. 123 ("Opinion and Order"). Now before the Court is Plaintiffs' motion for reconsideration of the Court's February 4, 2020 Opinion and Order pursuant to Federal Rule of Civil Procedure 54(b) and Local Civil Rule 6.3. Dkt. 124. For the reasons that follow, Plaintiffs' motion is denied.

## BACKGROUND

I.     **Factual Background**

The Court assumes familiarity with the factual background of this case, which was set forth in detail in its February 4, 2020 Opinion and Order.  Dkt. 123.  The Court here reiterates only the facts relevant to the instant motion.

A.     **Development of IQOS as an Alternative to Traditional Cigarettes**

As Philip Morris's sales of traditional cigarettes have declined in recent years, the Company has invested over $4 billion in the development of smoke-free alternatives.  *Id*. ¶¶ 3, 32. These products, known as reduced-risk products ("RRPs"), are marketed as presenting a lower health risk than traditional cigarettes.  *Id*. ¶ 3.  Philip Morris's flagship RRP, "iQOS," is an electronic device that heats specially designed tobacco units to release a flavorful nicotine-containing vapor without combustion, fire, ash or smoke.  *Id.* ¶ 35.  iQOS contains three main components: a heated tobacco unit (called HEETS or HeatSticks), an iQOS holder and a charger. *Id*.  iQOS was first introduced in the city of Nagoya, Japan in late 2014 and launched nationwide in Japan in the spring of 2016.  *Id*. ¶ 38.  During the Class Period, Japan was the only country in which iQOS was available nationwide.  *Id*.  Philip Morris promoted iQOS in Japan as a less harmful product than conventional cigarettes.  *Id*. ¶ 39.  This approach helped persuade Japanese officials to classify the iQOS device differently than traditional cigarettes, resulting in a lower tax rate and exempting it from ordinances banning smoking in public places.  *Id*. ¶¶ 39-41.

B.     **Defendants' Positive Projections About Growth in Japan in 2018**

On February 8, 2018, Philip Morris announced its financial results for the fourth quarter and year ended December 31, 2017, and reported that it had shipped 15.7 billion HeatSticks—a 60% increase from the prior quarter and a 325% year-over-year increase.  *Id*. ¶¶ 120-21.  The

Company also announced that the market share for HeatSticks in Japan had increased during the fourth quarter, from 11.9% in the prior quarter to 13.9%. *Id*. ¶ 122. During an earnings call that day, Defendant Calantzopoulos stated that the Company's growth in Japan was the result of an "increasing demand for HeatSticks, which we expect to grow further in the first quarter [of 2018] following a planned lifting of the restriction on iQOS device sales." *Id*. ¶¶ 123, 278. He declared, "We thus begin 2018 in excellent shape, with the supply of HeatSticks no longer an issue. The shipments of HeatSticks now shifted from air to lower-cost sea freight, and the capacity limits on IQOS device is behind us as of this month." *Id*. ¶ 280. Finally, Calantzopoulos stated, "there's nothing in the horizon that would affect—that would cause any change in what happened in the previous years." *Id*. ¶¶ 124, 283.

On February 21, 2018, Defendants Calantzopoulos, King, and Olczak each spoke on behalf of Philip Morris at the Consumer Analyst Group of New York ("CAGNY") conference. *Id*. ¶¶ 127, 287. During their remarks, these Defendants represented that Philip Morris was experiencing continued growth. In particular, Defendant Calantzopoulos stated that Philip Morris was a "growth stock" and that "8% plus currency-neutral net revenue growth is not just a 2017 or 2018 phenomenon." *Id*. ¶¶ 128, 287. Defendant Olczak spoke about the performance of iQOS in the Japanese market and stated, "This growth trend continued in January of 2018" while displaying a slide that showed iQOS's 16.3% national market share in Japan. *Id*. ¶¶ 129, 293; McDonough Decl. Ex. 9, at 42 ("CAGNY Presentation Slides"). He claimed, "Our weekly offtake shares in Japan continued to grow in January, both nationally and in the prefectures where the heated tobacco category is the most mature from a competitive standpoint."[1] *Id*. ¶¶ 130, 295. He also

---

[1] "Offtake share represents select C[onvenience]-Store sale volume for *HeatSticks* as a percentage of the total retail sales volume for cigarettes and heated tobacco units." CAC ¶ 130; CAGNY Presentation Slides at 45.

stated, "Our strong share performances for iQOS continue to be underpinned by high iQOS switching across markets . . . . The most obvious example is Japan," in a reference to switching consumers from conventional cigarettes to heated tobacco products.  *Id.* ¶¶ 132, 297.  Defendant King referred to the Company's iQOS performance as "remarkable."  *Id.* ¶ 134.

**C.  Defendants' Announcement About Slowing Growth in Japan and Subsequent Decline in Stock Value**

On April 19, 2018, Philip Morris issued a press release announcing its first quarter 2018 financial results and revealing that contrary to its prior projections, growth in iQOS sales had slowed in Japanese markets.  *Id.* ¶ 139.  Specifically, Defendants announced that the Company was experiencing "less-rapid-than-initially-projected growth in sales of devices to consumers in Japan in the first quarter, as we are now reaching more conservative adult smoker segments that may require, at least at first, slightly more time for adoption."  *Id.*  The Company reported 6.2 billion HeatStick shipments to Japan in the first quarter of 2018—nearly 7 billion fewer HeatSticks than the Company shipped to that market in the prior quarter.  *Id.* ¶ 140.

During an earnings call that day, Defendant King stated that the Company sold fewer iQOS devices in Japan than expected "due to still limited awareness of iQOS increased availability and, more importantly, to the fact that we are reaching, earlier in the year than we had anticipated, the more conservative consumers, especially the age 50-plus smoker segment, which represents approximately 40% of the total adult smoker population."  *Id.* ¶ 142; McDonough Decl. Ex. 22, at 5 ("April 19, 2018 Call Tr.").  He also stated that "we are now reaching different socioeconomic strata, with more conservative adult smokers who may have slightly slower patterns of adoption."  CAC ¶ 142; April 19, 2018 Call Tr. at 4-5.  Asked why the quarter-end result differed from the monthly market share figure provided at the February CAGNY conference, King further disclosed that the Company's market share growth in Japan had hit a "plateau," which Defendants were

"anticipating" would be reached later in 2018 "given that we knew the consumer dynamic that we had—close to saturating the early adopters and innovators". *Id.* ¶ 143; April 19, 2018 Call Tr. at 8.  Plaintiffs allege that Defendants had not previously communicated this dynamic to the market. CAC ¶ 143.  King also stated that the January market share numbers that he and his colleagues had presented at CAGNY were "probably a little overstated" due to changes in competitors' inventory shipments. CAC ¶ 146; April 19, 2018 Call Tr. at 8.  Finally, he claimed that "if this situation in Japan persists, then our volume estimate for heated tobacco units will be more in the range of 55 billion to 60 billion versus the over 60 billion that we had called out before." CAC ¶ 147; April 19, 2018 Call Tr. at 10.

Following the announcement, Philip Morris's common stock fell $15.80 per share, or more than 15%, from $101.44 per share on April 18, 2018 to close at $85.64 per share on April 19, 2018. CAC ¶¶ 13, 152.  This drop represented the worst daily decline for the Company's stock in nearly a decade. *Id.* ¶ 13.

## II.    Procedural History

On September 5, 2018, the City of Westland Police and Fire Retirement System, a purchaser of Philip Morris common stock during the Class Period, commenced this action by filing a class action complaint against Defendants Philip Morris, Calantzopoulos, King, and Olczak. Dkt. 9.  On February 25, 2019, the Court appointed Union Asset Management Holding AG and Teamsters Local 710 Pension Fund as Co-Lead Plaintiffs, consolidated three related actions, and appointed Co-Lead Counsel.  Dkts. 82, 83.

On May 10, 2019, Lead Plaintiffs filed a Consolidated Amended Class Action Complaint ("CAC") naming Defendants Picavet, Peitsch, and Lüdicke in addition to the initial defendants. Dkt. 92.  On July 12, 2019, Defendants filed a motion to dismiss Plaintiffs' Consolidated Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the

Private Securities Litigation Reform Act.  Dkts. 107-109.  Following briefing, Dkts. 113-116, and oral argument, the Court issued an Opinion and Order granting Defendants' motion to dismiss on February 4, 2020, Dkt. 123.  The Court first held that Plaintiffs had not adequately alleged that any of the statements in the CAC were false or misleading, as some of the statements in were in fact true at the time they were made while others were inactionable puffery, subjective statements of opinion, or forward-looking statements.  *Id*. at 20-36.  The Court next held that that Plaintiffs had failed to adequately allege scienter.  *Id*. at 36-41.  With the exception of Plaintiffs' claims related to Defendants' alleged failure to timely disclose four scientific studies, all of Plaintiffs' claims were dismissed with prejudice.  *Id*. at 29-30, 42.

On February 18, 2020, Plaintiffs filed a motion for reconsideration of the Court's February 4, 2020 Opinion and Order.  Dkts. 124-26 ("Mot. Recons.").  Defendants opposed the motion on March 3, 2020, Dkt. 130 ("Opp. Recons."), and Plaintiffs replied in support thereof on March 10, 2020, Dkt. 131 ("Reply Mot. Recons").

## LEGAL STANDARD

Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  *In re Health Mgmt. Sys., Sec. Litig.*, 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000) (citation omitted).  "The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court." *Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584, 594 (S.D.N.Y. 2011).

Motions for reconsideration are properly granted only upon a showing of an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).   The standard for granting a motion for reconsideration "is strict and

reconsideration is generally denied" as such motions are "not a vehicle for reargument or asserting arguments that could and should have been made before judgment issued." *Weiss v. City of New York*, No. 96-CV-8281 (LTS)(MHD), 2003 WL 21414309, at *1 (S.D.N.Y. June 19, 2003) (internal quotation marks and citation omitted).

## DISCUSSION

Plaintiffs urge the Court to reconsider three aspects of its prior Opinion and Order. Plaintiffs first contend the Court improperly dismissed their claim that Defendants' SEC filings failed to comply with two SEC disclosure requirements: Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303"), and Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"). Plaintiffs also argue that the Court erred in finding that Defendant Calantzopoulos's statement—"there's nothing in the horizon that would . . . cause any change in what happened in the previous years"—was forward-looking. Finally, Plaintiffs asserts that the Court improperly dismissed all of their claims—other than those related to the four scientific studies that Defendants allegedly failed to disclose—with prejudice. For the reasons that follow, the Court holds that Plaintiffs have failed to establish circumstances warranting reconsideration.

## I.      Plaintiffs' Item 303 and Item 503 Claims

Items 303 and 503 both require certain disclosures in SEC filings, including Forms 10-K and 10-Q. Specifically, Item 303 requires a corporation to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also id.* § 229.303 instruction 3 (explaining disclosures should "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"). "Item 303's affirmative duty to disclose in Form 10–Qs can serve as the

basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). The Second Circuit has explained that "omitting an item required to be disclosed on a 10-Q can render that financial statement misleading," because "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of 'known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" *Id*. at 102 (quoting 17 C.F.R. § 229.303(a)(3)(ii)). "The failure to make a required disclosure under Item 303, however, is not by itself sufficient to state a claim for securities fraud under Section 10(b). Significantly, Rule 10b–5 makes only 'material' omissions actionable." *Id*. at 102 (quoting 17 C.F.R. § 240.10b–5(b)).

Item 503 requires a corporation to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make an investment" in a security "speculative or risky," and requires each risk factor to "adequately describe[] the risk." 17 C.F.R. § 229.105.[2] "[C]ourts have generally found Item 503 violations to track Rule 10b–5 violations . . . [and] analyze the sufficiency of Item 503 disclosures with the familiar materiality standard." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011).

Plaintiffs' CAC alleged that the Item 303 "disclosures in Philip Morris's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose the known uncertainties associated with," *inter alia*, "the level of saturation among the early adopters and innovators in Japan and how that would impact iQOS and

---

[2] On May 2, 2019, the SEC relocated the former Item 503(c), then-codified at 17 C.F.R. §229.503(c), to Item 105, now codified at 17 C.F.R. § 229.105. The Court nonetheless refers to the claim as an Item 503 claim for the sake of consistency with the parties' pleadings and briefings as well as its prior Opinion and Order.

HeatStick sales in 2018." CAC ¶ 306.[3]  Similarly, Plaintiffs' CAC alleged that Philip Morris failed

to make adequate Item 503 disclosures in the Forms 10-K and 10-Q filed during the Class Period,

including by failing to disclose "the risk that the market for early adopters and innovators in Japan

might have reached saturation such that growth of iQOS and HeatStick sales would slow in the

first quarter of 2018" in violation of Item 503.  *Id*. ¶ 308.[4]  In their motion for reconsideration,

Plaintiffs contend that the Court erred in dismissing the Item 303 claim because it failed to

adequately consider the April 19, 2018 revelation that the Company's market share growth had hit

a "plateau," which Defendants were "anticipating" would be reached later in 2018 "given that we

knew the consumer dynamic that we had—close to saturating the early adopters and innovators."

Mot. Recons. at 4-5 (quoting CAC ¶ 143; April 19, 2018 Call Tr. at 8).  Plaintiffs similarly argue

that the Court wrongly dismissed their Item 503 claim because "Philip Morris's Class Period SEC

filings, and in particular the 2017 Form 10-K . . . failed to disclose the risk that the iQOS market

for early adopters and innovators in Japan might have reached saturation."  *Id*. at 8.  Plaintiffs

---

[3] The CAC also alleged that Defendants' Forms 10-K and 10-Q during the Class Period "failed to disclose the known uncertainties associated with . . . consumer demand following the FDA panel's rejection of Philip Morris's claim that iQOS is safer than cigarettes based on the flawed clinical studies and other evidence rebutting that claim; and . . . the accuracy of Philip Morris's Japanese market share number as compared to its competitors."  CAC ¶ 306.  Yet the Item 303 argument in Plaintiffs' motion for reconsideration is focused exclusively on Defendants' alleged failure to disclose the market saturation of "early adopters and innovators."  *See* Mot. Recons. at 1, 4-7.  The Court thus does not address the other Item 303 allegations in the CAC here.

[4] The CAC also alleged that Defendants' Forms 10-K and 10-Q during the Class Period failed to disclose "that the risk that Philip Morris would not obtain approval from the FDA to sell iQOS in the United States as a modified risk tobacco product was undermined by the fact that: (i) some of the iQOS clinical study results were invalid, as Philip Morris failed to comply with GCP and other generally accepted clinical study practices; and (ii) other scientific studies conducted by Philip Morris showed that iQOS contained compounds of toxicological concern in higher quantities than in conventional cigarettes, all of which were known to Defendants." Again, Plaintiffs' motion for reconsideration focuses only on Defendants' alleged failure to disclose the potential market saturation, *see* Mot. Recons. at 1, 8, and the Court therefore does not address the other Item 503 allegations in the CAC here.

assert that Defendants "did not disclose the anticipated risk at all, only providing boilerplate disclosures that were not 'accurate and candid.'" *Id*. (quoting *Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *18 (S.D.N.Y. Mar. 8, 2017).

In its February 4, 2020 Opinion and Order, the Court dismissed Plaintiffs' Items 303 and 503 claims, holding that Defendants had adequately disclosed in its SEC filings the known uncertainties and the most significant factors that make an investment speculative or risky. Plaintiffs have failed to persuade the Court to grant reconsideration of that holding. Philip Morris's 2017 Form 10-K, filed on February 13, 2018, stated that the demand for HeatSticks was "anticipated to further increase in the first quarter of 2018," yet included a disclaimer that it "cannot guarantee that any forward-looking statement will be realized." CAC ¶ 285; McDonough Decl. Ex. 3, at 6, 24. The Form 10-K provided that forward-looking statements were identifiable by the use of words such as "anticipates," "expects," "believes," "estimates," "intends," "projects," "goals," or "targets." *Id*. at 6. It also identified specific risk factors including "governmental action aimed at increasing regulatory requirements with the goal of reducing or preventing the use of tobacco products," "failure to compete effectively" and failure to "anticipate changes in consumer preferences." *Id*. at 7-9. Most relevant here, the 10-K provided that "[t]o be successful, we must . . . convince adult smokers to convert to our RRPs." *Id*. at 9; *see also id*. at 8 ("We compete primarily on the basis of product quality, brand recognition, brand loyalty, taste, R&D, innovation, packaging, customer service, marketing, advertising and retail price and, *increasingly, adult smoker willingness to convert to our RRPs*.") (emphasis added).

Contrary to Plaintiffs' representation, these disclosures were far from "boilerplate." Mot. Recons. at 8. Rather, they convey the precise risk that Plaintiffs contend Defendants failed to disclose—that they would need to "convince adult smokers to convert to [their] RRPs."

McDonough Decl. Ex. 3, at 9.  Although Defendants did not explicitly frame their disclosure in terms of the risk of saturating the market of early adopters and innovators, their disclosure that they "increasingly" compete on the basis of "adult smoker willingness to convert to [their] RRPs" describes the flipside of the very same coin.  *Id*.  This is especially so when the so-called revelation that Plaintiffs contend Defendants unlawfully excluded from their SEC filings—that the Company's market share growth had hit a "plateau," which Defendants were "anticipating" would be reached later in 2018 given that they were "close to saturating the early adopters and innovators"—is viewed  in light of the full context of the April 19, 2018 earnings call transcript. Earlier in the call, Defendant King—the same Defendant who made the comment about saturation—stated:

> We observed, however, that device sales were slower than our ambitious expectations. This was due to still limited awareness of iQOS' increased availability and, more importantly, to the fact that we are reaching, earlier in the year than we had anticipated, the more conservative consumers, especially the age 50-plus smoker segment, which represents approximately 40% of the total adult smoker population. In general, these consumers are likely to display, at least initially, a slower pace in entering the RRP category. That is, they are less likely to be in the innovators and early adopters groups shown on this chart. Instead, they are relatively overrepresented in the late majority and laggard groups, which are larger in size. This is common with any new product category, and especially RRPs and iQOS in particular, given their phenomenal speed of growth in Japan.

McDonough Decl. Ex. 22, at 5 ("April 19, 2018 Call Tr.").  This statement makes clear that Philip Morris's disclosure in its 2017 10-K about the need to convert adult smokers—who are "less likely to be in the innovators and early adopters groups," *id*.—addresses the very issue that Plaintiffs contend Defendants unlawfully failed to disclose.

Accordingly, Plaintiffs have failed to establish circumstances warranting the use of the "extraordinary remedy" of reconsideration with respect to the Court's prior holding that Defendants satisfied their disclosure obligations under Items 303 and 503.  *In re Health*

*Mgmt. Sys., Inc. Sec. Litig.*, 113 F. Supp. 2d at 614.

## II.   Defendant Calantzopoulos's "Horizon" Statement

Plaintiffs next contend that the Court erred in finding that Defendant Calantzopoulos's statement—"there's nothing in the horizon that would . . . cause any change in what happened in the previous years"—was forward-looking.  CAC ¶ 283.  Specifically, Plaintiffs argue that the statement is not forward looking "as it expressed [Calantzopoulos's] *current* understanding that there was nothing 'in the horizon' *at that moment* that would negatively affect HeatStick volumes in Japan."  Mot. Recons. at 9 (emphasis in original).  The Court disagrees.  As an initial matter, Plaintiffs already made this argument in their Opposition to Defendants' Motion to Dismiss.  Dkt. 115, at 17-19.  "Because a motion for reconsideration is not an opportunity to reiterate arguments that were previously considered and rejected, a motion for reconsideration on this ground is unwarranted."  *Great Am. Ins. Co. v. Zelik*, 439 F. Supp. 3d 284, 288 (S.D.N.Y. 2020) (citation omitted); *see also Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500 (S.D.N.Y. 2008) ("Where the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts, the motion for reconsideration must be denied.").

In any event, the Court remains persuaded that Defendant Calantzopoulos's statement constitutes a forward-looking statement.  His claim that "there's nothing in the horizon that would . . . cause any change in what happened in the previous years" is clearly focused on the future—the horizon—rather than the present.  If Defendant Calantzopoulos had intended to discuss the present, he could have stated something to the effect that "there are no current conditions that would . . . cause any change in what happened in the previous years."

Plaintiffs nonetheless argue that "[e]ven if it could be argued that there were forward-looking *aspects* to this statement, the safe harbor would still not apply, as it is well settled that the

present portions of a mixed statement—that is, a statement with both present or historical and forward-looking components—are not protected by the safe harbor."  Mot. Recons. at 9-10 (citations omitted).  "[A] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (internal quotation marks and citations omitted).  Here, however, there are no elements of Defendant Calantzopoulos's statement that are equivalent to those the Second Circuit has determined constitute present portions of mixed statements.  *See e.g.*, *id.* at 246 (finding portion of statement that company entered the year "with a very strong balance sheet" was a present representation within a longer statement that contained "some aspects [that] could conceivably be characterized as forward-looking").  To the contrary, Defendant Calantzopoulos's statement looks wholly to the future, irrespective of his use of the present-tense verb "is" in the contraction "there's."  Moreover, even if, *arguendo*, Defendant Calantzopoulos's use of the word "there's" was intended to be read in the present tense, it would be "so vague as to be inseparable from the forward-looking portions of the statements."  *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) ("[T]o the extent that there are assertions of current fact in the statements proffered as fraudulent, they refer to the present only as a means for gauging future possibilities and, 'when read in context, cannot meaningfully be distinguished from the future projection of which they are a part.'") (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009)).

The Court thus finds no grounds on which to grant a motion for reconsideration with respect to Defendant Calantzopoulos's statement.

## III.   Dismissal With Prejudice

Finally, Plaintiffs urge the Court to reconsider its decision to dismiss most of Plaintiffs'

claims with prejudice, with the exception of the claims regarding Defendants' alleged failure to timely disclose four scientific studies.  *See* Mot. Recons. at 11-12.  Plaintiffs assert that they "are not . . . presently requesting leave to amend (despite reserving their right to do so at a later date).  Rather, they are simply asking for an opportunity to replead."  *See* Reply Mot. Recons. at 9; *see also* Mot. Recons at 12 n.5 ("If the Court denies reconsideration on this issue, Plaintiffs reserve their right to file a motion for leave to amend pursuant to Rule 15(a)(2).").  At the same time, Plaintiffs state that "[i]f granted a broader leave to amend, Plaintiffs intend to allege facts demonstrating, *inter alia*, that:"

- Defendants knew that their statements about iQOS being less harmful than conventional cigarettes were false and misleading, as those statements omitted or misrepresented substantial evidence showing that iQOS contains numerous other toxic substances, and that there is no evidence demonstrating that iQOS is less harmful than conventional cigarettes;

- Defendants did not believe the statements the Court found to be inactionable as puffery or opinion, and Defendants failed to disclose facts that "conflict[ed] with what a reasonable investor would take from the statement[s]" themselves. Order at 25; and

- Defendants made additional false and misleading statements during the Class Period concerning iQOS, including that Philip Morris was transparent in communicating the results of its scientific studies of iQOS.

Mot. Recons. at 12.  They also "request reconsideration of the Court's dismissal with prejudice so that they can file an amended complaint."  *Id*.  The Court thus construes Plaintiffs' motion as one to amend.

A motion to amend is evaluated under Federal Rule of Civil Procedure 15(a), which provides that "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000).  Notwithstanding the liberal standard of Rule 15(a), however, a court may deny leave "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).   "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)."   *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).   District courts have broad discretion in ruling on a motion for leave to amend a complaint. *See Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 96 (S.D.N.Y. 2010) (collecting cases); *see also Orellana v. Macy's Retail Holdings, Inc.*, No. 17 Civ. 5192 (NRB), 2018 WL 3368716, at *7 (S.D.N.Y. July 10, 2018) ("Whether to grant leave, however, is ultimately 'within the sound discretion of the district court.'") (quoting *McCarthy*, 482 F.3d at 200).

Here, Plaintiffs identify no compelling grounds for reconsideration of the Court's prior decision to dismiss most of their claims with prejudice.   Dismissal of those claims with prejudice was proper because amendment would be futile.   *See Dougherty v. Town of N. Hempstead. Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6).").   The CAC—a 130-page complaint, filed more than eight months after the commencement of this action and after the Court appointed co-lead plaintiffs, approved co-lead counsel, and consolidated three related actions, Dkts. 82-83—is significantly more extensive than the initial complaint filed by co-lead counsel, Dkt. 9. *See Singh v. Schikan*, No. 14 CIV. 5450 NRB, 2015 WL 4111344, at *2 (S.D.N.Y. June 25, 2015) (denying motion for reconsideration regarding dismissal of securities class action claims with prejudice where the complaint dismissed by the court's prior opinion was already an amended complaint filed after the court appointed a lead plaintiff, was significantly longer than the original complaint, and was filed by the same attorneys); *In re Gildan Activewear, Inc. Sec. Litig.*, 08 Civ. 5048(HB), 2009 WL 4544287, at *5 (S.D.N.Y. Dec. 4, 2009) .   After Defendants filed a motion

to dismiss raising deficiencies in the CAC, Dkt. 107, Plaintiffs informed the Court, pursuant to Rule 4(c) of the Court's Individual Rules & Practices, that it would rely on the CAC rather than file an amended pleading.  Dkt. 110; *see also Singh*, 2015 WL 4111344, at *2 ("After the filing of the Amended Complaint, plaintiffs were free to request further leave to amend at numerous points before the Court entered its decision, whether upon receiving defendants' letter in anticipation of filing a motion to dismiss, upon receiving defendants' briefing on the motion to dismiss, or upon hearing defendants' arguments at oral argument.").  Plaintiffs first raised the possibility of seeking leave to amend if the Court dismissed the CAC for the first time in a cursory footnote in its opposition to Defendants' motion to dismiss.  Dkt. 115 at 35 n.35; *see also See, e.g., In re Lehman Bros. Mortgage–Backed Sec. Litig.*, 650 F.3d 167, 188 (2d Cir. 2011) (affirming dismissal with prejudice where "[i]n their briefs in opposition to the motions to dismiss, plaintiffs requested leave to amend without specifying what additional facts, if any, they might assert in a new pleading").

Now, even with the benefit of the Court's Opinion and Order regarding the numerous deficiencies in the CAC, Plaintiffs provide only three vague bullet points regarding the additional facts they would allege if granted leave to amend.  The Court notes that the third bullet— concerning Philip Morris's alleged statement(s) that it was transparent in communicating the results of scientific studies regarding iQOS—appears to relate to Plaintiffs' claims about the undisclosed studies, and thus fits squarely within the scope of the amendments the Court already held were permissible.  The first and second bullets, however, are so vague as to render it impossible to discern how the proposed amendments would differ from the existing allegations in the CAC.  *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (per curiam) (holding district court did not abuse its discretion in not granting leave to amend for a second time where "plaintiff's counsel did not advise the district court how the complaint's defects would be

cured").

In light of the various opportunities Plaintiffs have already had to amend the complaint, as well as Plaintiffs' failure to assert with any specificity how they would cure the deficiencies in the CAC, the Court remains persuaded that amendment would be futile. The Court thus denies Plaintiffs' motion to grant reconsideration of its decision to dismiss most of their claims with prejudice.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for reconsideration is denied. If Plaintiffs intend to file a Second Amended Class Action Complaint that includes additional factual allegations regarding the four allegedly undisclosed studies, they shall do so no later than September 28, 2020 in light of the seven and a half months that have passed since the Court's initial Opinion and Order granting the motion to dismiss and leave to amend with respect to those studies. No extensions will be granted. The Clerk of Court is respectfully directed to terminate the motion for reconsideration pending at Docket Entry 124, as well as the motion for oral argument pending at Docket Entry 132, as the Court has deemed argument unnecessary to resolve the instant motion.

SO ORDERED.

Date:   September 21, 2020
        New York, New York

_____
RONNIE ABRAMS
United States District Judge